## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ERIC KELLEY,** | |
| Plaintiff, | Civ. No. 2:19-cv-17911 (WJM) |
| v. | |
| **RICHARD REYES, LOUIS STELL, ROBERT SMITH, ESTATE OF MICHAEL FINER, ALEX NIEVES, PETER IURATO, TIMOTHY JORDAN, RAYMOND REID, ALBERT CLARK, in their individual capacities, RICHARD MUNSEY and VINCENT AMORESANO, in their official capacities, and THE CITY OF PATERSON,** | |
| Defendants. | |
| **RALPH LEE,** | |
| Plaintiff, | Civ. No. 2:19-cv-17936 (WJM) |
| v. | |
| **ALBERT CLARK, ESTATE OF MICHAEL FINER, PETER IURATO, TIMOTHY JORDAN, ALEX NIEVES, RAYMOND REID, RICHARD REYES, ROBERT SMITH, LOUIS STELL, and JOHN DOES #1-10, in their individual capacities, RICHARD MUNSEY and VINCENT AMORESANO, in their official capacities, and THE CITY OF PATERSON,** | **OPINION** |
| Defendants. | |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs Eric Kelley and Ralph Lee, Jr. ("Plaintiffs") spent 24 years incarcerated for the robbery of a video store in Paterson, New Jersey and murder of the store clerk—crimes that they contend they did not commit. After DNA testing in 2014 proved that the distinctive green plaid baseball hat left at the crime scene was worn by Eric Dixon, Plaintiffs Kelley and Lee in separate actions, filed various civil rights and related claims against the City of Paterson ("Paterson" or "City") and members of the Paterson Police Department ("PPD") in their individual capacities—Lieutenant Albert Clark, the Estate of Detective Michael Finer,[1] Detectives Peter Iurato, Timothy Jordan, Alex Nieves, Richard Reyes, Robert Smith, Sergeants Raymond Reid, and Louis Stell ("individual Defendants").[2] Before the Court are ten separate motions for summary judgment filed in each case by:

1.  City of Paterson, Kelley ECF No. 226, Lee ECF No. 200;
2.  Sgt. Reid, Kelley ECF No. 216, Lee ECF No. 192;
3.  Estate of Finer, Kelley ECF No. 217, Lee ECF No. 193;
4.  Lt. Clark, Kelly ECF No. 218, Lee ECF No. 194;
5.  Reyes, Kelly ECF No. 219, Lee ECF No. 195;
6.  Iurato (joins in Reyes' motion), Kelly ECF No. 222, Lee ECF No. 197;
7.  Jordan, Kelly ECF No. 221, Lee ECF No. 196;
8.  Smith, Kelly ECF No. 223, Lee ECF No. 198;
9.  Sgt. Stell, Kelly ECF No. 220, Lee ECF No. 237;
10. Nieves, Kelly ECF No. 224, Lee ECF No. 235.

The Court decides these motions without oral argument. Fed. R. Civ. P. 78(b). For the reasons stated below, the motions are **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Around 1:30 p.m. on July 28, 1993, Plaintiffs claim that Eric Dixon robbed Victoria's Video in Paterson, New Jersey and murdered the store clerk, Tito Dante Merino. *See* Pls. Stmt. Of Add'l Material Facts (PSAMF) ¶ 1, Kelly ECF No. 234; Lee ECF No. 208. Lt. Clark and Sgt. Stell assigned Det. Reyes to be lead detective for the homicide and Sgt. Reid, Finer, Smith, Iurato, Nieves, and Jordan to assist. Reyes Stmt. of Material Facts (SUMF), ¶ 5, Kelley ECF No. 219-2, Lee ECF No. 195-2; City of Paterson Stmt. Of Material Undisputed Facts (Paterson SUMF) ¶ 6, Kelley ECF No. 226-1, Lee ECF No. 200-1. Initial interviews with three witnesses who stopped by the store around the time of the murder - Majdi Mousa, Carmen Paredes, and James Thompson - supported the theory that the perpetrator was a lone medium-built Black man wearing a green plaid hat. PSAMF

---

[1] Finer passed away on May 23, 2018. Finer Stmt. Of Material Facts, ¶ 15, Kelley ECF No. 217; Lee ECF No. 193.

[2] The claims against Vincent Amoresano and Richard Munsey have been dismissed. *See* July 1, 2020 Op., Kelley ECF No. 81; Lee ECF No. 68.

¶ 4. In a statement to the police that day, Mr. Mousa stated he saw a Black man coming out from the back room of the store bleeding from his right ear and with blood on both his arms and shirt. *Id.* at ¶ 4b.

On July 30, 1993, Jordan and Sgt. Reid, who were assigned to canvas the neighborhood in search of possible witnesses to the homicide, received information from a "confidential source"[3] claiming to have observed two Black males (one identified as "the son of Mr. Lee" and the other as "K.C."), and a white male ("the son of Mrs. Rose") in front of the video store around the time of the homicide. PSAMF, ¶¶ 131-132; Jordan Stmt. Of Undisputed Material Facts (Jordan SUMF) ¶¶ 7-9, Kelley ECF No. 221-2, Lee ECF No. 196-2. In addition to the anonymous source, according to Reyes, the PPD purportedly received corroborating information from a woman at a laundromat who overheard that two Black men and one white man were seen outside Victoria's Video around the time of the murder. City of Paterson Stmt. Of Undisputed Material Facts (Paterson SUMF) ¶ 34, Kelley ECF No. 226-1, Lee ECF No. 200-1.

Sgt. Reid's handwritten notes show the last name "Lee" with first name "Travis" and "yes" next to it and first name "Ralph" crossed out. PSAMF ¶ 133. The notes also indicate that "K.C." or "Kasey" was seen hours earlier wearing "green shorts/gray top" with a scratch on his right cheek area. *Id.* The third person identified by the confidential source was Greg McCourt, but Mr. McCourt turned out to have an alibi. *Id.* at ¶ 141. While not reflected in Sgt. Reid's contemporaneous notes, the source allegedly informed police that the two Black males were "in the brick building on the corner of Jasper and Union Avenue up on the balcony." Paterson SUMF ¶ 24, Jordan SUMF ¶ 10. Upon receiving a radio transmission of a male that Defendants claim fit the description of KC nearing his detective vehicle, Sgt. Reid stopped Mr. Kelley. Paterson SUMF ¶¶ 26-27.

Sgt. Reid, Jordan, and Sgt. Stell found Mr. Lee in the stairwell of the brick apartment building. *Id.* at ¶ 31; Jordan SUMF ¶ 11. Mr. Lee does not dispute that he agreed to go to the police station for an interview. Jordan SUMF ¶ 11. Iurato, Nieves, and Sgt. Stell transported Mr. Lee to the police station in the back of a police car. PSAMF ¶ 41. Mr. Lee maintains he was handcuffed, but he does not know by whom. *Id.*; Lee Dep. 13:18-21, Pls. Ex. 134, Kelley ECF No. 234-135, Lee ECF No. 208-135.

Mr. Kelley was nearby but not in the building at Jasper and Union; Sgt. Reid stopped him because he "fit the description" given by the confidential source, *see* PSAMF ¶ 151, even though at the time, Mr. Kelley did not have a scratch on his face and was not wearing a gray top. *Id.* at ¶¶ 136-137, 155. Plaintiffs dispute that Mr. Kelley has ever gone by the nickname "KC," "Kasey," or "Kasey." Pls. Resp. to Paterson SUMF ¶ 28, Kelley ECF No. 235, Lee ECF No. 209; PSAMF ¶ 135. At Sgt. Reid's request, Mr. Kelley agreed to go to the police station. Pls. Resp. to Paterson SUMF ¶ 29. According to the PPD Supplemental Report (PPD Report) written by Reyes, Mr. Kelley was transported to the police bureau by Reyes and Finer. PPD Report at Kelley_Police 014, Pls. Ex. 6, Kelley ECF No. 237-2, Lee

---

[3] The unknown source was not identified, located, or asked to view photographs or a live lineup. PSAMF ¶ 164.

ECF No. 211-2. There, Mr. Kelley and Mr. Lee were separately interrogated for hours. PSAMF ¶¶ 57, 87.

### A. Kelley's Confession

Sgt. Stell, Reyes, Smith, Finer, and Jordan were in the room with Mr. Kelley at some point during the July 30 interrogation. *Id.* at ¶ 31.[4] Mr. Kelley, who had a severe heroin addiction as well as serious cognitive limitations, denied any knowledge of the murder. *Id.* at ¶¶ 21, 28, 32. Refusing to accept that, Sgt. Stell got angry and struck Mr. Kelley on the head with an open hand, which Reyes and Jordan witnessed. *Id.* at ¶¶ 35, 37; Kelley Dep. 32:22-33:5, Pls. Ex. 135, Kelley ECF No. 234-136, Lee ECF No. 208-136. Reyes and Sgt. Stell insisted that Mr. Kelley committed the murder and demanded that he tell the truth. PSAMF ¶ 33; Kelley Dep. 22:15-25. Reyes promised Mr. Kelley that if he gave Defendants the statement they wanted, he would be allowed to go home. *Id.* at ¶ 34; Kelley Dep. 23:1-4. According to Reyes, Finer remarked that he would call Mr. Kelley's mother to let her where he was and then, Mr. Kelley began his "free-flowing narrative" confession at about 3:35 or 3:40 p.m. *Id.* at ¶ 89; Reyes Dep. 350:19-22, 356:3-13, 357:4-10, Pls. Ex. 126, Kelley ECF No. 234-127, Lee ECF No. 208-127. Mr. Kelley's waiver of *Miranda* rights form indicates it was taken at 3:30 p.m. and is signed by Jordan and Sgt. Stell as witnesses. PPD Report at Kelley_Police 078-085 (Kelley *Miranda* Waiver). After the unrecorded oral confession, at 4:20 p.m., Smith assisted Reyes in taking Mr. Kelley's formal six-page written statement. PPD Report at Kelley_Police 080-085 (Kelley Confession); *see* PSAMF ¶¶ 31, 89. Mr. Kelley claims he agreed to give a confession under duress and before being read his *Miranda* rights. PSAMF ¶ 39.

In the written confession, which also implicated Mr. Lee, Mr. Kelley admitted stabbing the store clerk and stated that the green cap he wore on the day of the murder belonged to him. Kelley Confession at Kelley_Police 082; Paterson SUMF, ¶ 44. Between 4:20 and 5 pm, Mr. Kelley identified a photograph of David Hancock, even though that photo was purportedly not taken until about 7 p.m. that night. PSAMF ¶ 91. Mr. Kelley then consented to a search of his home. *Id.* at ¶ 90. He stated that the clothes he wore at the time of the murder had blood on them and that he had put the clothes in a hamper at home. *Id.* at ¶ 70. Those clothes were collected during the search but when tested, showed no blood on them. *Id.*

Mr. Kelley's confession incorporated other facts that were never corroborated such as details regarding the sale of some of the stolen goods to Bob's Supermarket and elsewhere. *Id.* at ¶¶ 60-63, 68. Defendants were not able to find the murder weapon that according to Reyes' PPD Report, Mr. Kelley stated he threw in an alleyway on Wayne Ave and Union Ave. *Id.* at ¶ 67. Other details in both Mr. Kelley and Mr. Lee's confessions also later proved incorrect including whether a yellow chair with blood on it was moved before or after the victim died and whether the victim walked to the back of the store or his body

---

[4] Paragraph 31 of PSAMF states Defendants were in the interrogation room with Mr. Kelley on *June 30, 1996*, which the Court assumes is a typographical error.

was carried there after he died. *Id.* at ¶¶ 62, 63.

B. <u>Lee's Confession</u>

Mr. Lee, who also had serious cognitive limitations and a severe heroin addiction at the time, *see* PSAMF ¶¶ 21, 28, recalls that seven to nine officers, including Nieves, beat him and repeatedly insisted that he was lying. *Id.* at ¶ 46; Lee Dep. 19:25-20:23; Lee Aff., Pls. Ex. 150, Kelley ECF No. 234-151, Lee ECF No. 208-151. In addition to accusing him of lying, Mr. Lee also contends Nieves gestured menacingly toward his gun and punched him in the nose. PSAMF ¶¶ 46, 47; Lee Dep. 76:3-14; Lee Aff. Mr. Lee's nose continued to bleed while he was screaming that he did not do anything but officers continued to declare that he was lying. Lee Dep. 20:24-22:8; Lee Aff. Eventually, officers told him that Mr. Kelley had confessed. *Id.* at 20:20-23; Lee Aff. Despite denying any involvement in the homicide, Mr. Lee agreed to sign a statement confessing to the crime. PSAMF ¶ 48. Nieves and Iurato took Lee's statement while Sgt. Stell was going back and forth between the two interrogations. *Id.* at ¶ 42; PPD Report at Kelley_Police 086-092 (Lee Confession). Iurato typed up Mr. Lee's written statement. Iurato Dep. 167:22-168:1; 179:13-14, Pls. Ex. 145; Kelley ECF No. 234-146, Lee ECF No. 208-146; Paterson SUMF ¶¶ 49, 50. Iurato and Nieves signed as witnesses to Mr. Lee's confession, as well as to Mr. Lee's waiver of *Miranda* rights. Lee Confession at Kelley_Police 092; PPD Report at Kelley_Police 070.

Mr. Lee's five-page confession statement depicts how Mr. Lee tried to wipe away blood from the crime scene using a "rag" that he left in the back room where the victim was found. PSAMF ¶ 69; PPD Report at Kelley_Police 090. Defendants never found that rag. PSAMF ¶ 69. Mr. Lee's confession also contains a description of the clothes Mr. Kelley was wearing at the time of the crime. *Id.* at ¶ 70. Contrary to PPD procedure on confessions, which was to type questions and answers verbatim as they are being given, *see id.* at ¶ 74, in the notes file maintained by Reyes, there was a handwritten script of Mr. Lee's confession. Pls. Resp. to Jordan SUMF ¶ 2q., Kelley ECF No. 236, Lee ECF No. 210; Handwritten Confession, Pls. Ex. 70, Kelley ECF No. 234-71, Lee ECF No. 208-71. The handwritten confession is substantially the same as the typed confession. PSAMF ¶ 78. The existence of handwritten Q and A's would be a "red flag" that the confession could have been fabricated. Reid Dep. at 135:18-22, 136:7-137:16, Pls. Ex. 131, Kelley ECF No. 234-132, Lee ECF No. 208-132; PSAMF ¶¶ 74-79.

C. <u>Witnesses and Other Evidence</u>

On July 31, 1993, after Plaintiffs were arrested, James Thompson, one of the witnesses who had stopped by the video store around the time of the murder, viewed two photo lineups that included photos of Mr. Kelley and Mr. Lee. PSAMF ¶¶ 101, 106. Mr. Thompson, who had seen a medium-built Black man behind the counter, was unable to identify the perpetrator, but told Reyes the man in the store was someone he had never seen before and that he recognized Messrs. Kelley and Lee from the neighborhood. *Id.* at ¶¶ 103-106. Reyes excluded that statement in the PPD Report and instead wrote that Thompson "had not had a good look at the person in the store and could not identify him."

*Id.* at ¶ 108. Sgt. Reid wrote in his notes: "concerned with Thompson." *Id.* at ¶ 107.

Another witness, Mr. Mousa, viewed two series of photo lineups on July 31, 1993, but could not identify anyone. PPD Report at Kelley_Police 019.

On August 4, Carmen Paredes identified Mr. Lee in a photo lineup as the man she saw in the video store. PSAMF at ¶ 124. Her written statement was taken by Reyes and Iurato. *Id.* Although Ms. Paredes reported seeing only one Black man in the store, Iurato and Reyes showed her an additional 8-person lineup featuring Mr. Kelley. *Id.* at ¶ 129.

Reyes and Iurato took a statement on August 11, 1993 from Dennis Williams that he saw both Plaintiffs together near the murder scene and overheard Mr. Kelley say "why did we kill that guy if we wanted a bag of dope we didn't have to kill that guy for it." Paterson Ex. U, Kelley ECF No. 260-37, Lee ECF No. 234-38; PPD Report at Kelley_Police 022.

David Hancock is a white man whom both Plaintiffs separately implicated as the third participant in the robbery. PSAMF ¶ 64. Mr. Kelley purportedly stated during his interrogation, that after the robbery, he and Mr. Hancock sold some of the stolen goods, including the VCR, to Bob's Supermarket. *Id.* at ¶ 117. According to the PPD Report, on August 1, 1993, the owner of Bob's Supermarket told Reid that "a white male" had tried to sell the VCR to a cashier named Carmen who had left for Peru on vacation for three weeks. *Id.* at ¶¶ 118-119. Sgt. Reid's contemporaneous handwritten notes, however, indicate that Sgt. Reid spoke to Carmen who told him that *three* white men had tried to sell her a VCR, and questioned: "what are we doing with Carmen from Bobs." *Id.* at ¶¶ 121-122; Pls. Ex. 9 at CITY 001335; Kelley ECF No. 234-10, Lee ECF No. 208-10, 211-5; Pls. Ex. 7 at CITY 001353, Kelley ECF No. 237-3, Lee ECF No. 211-3. The charges against Mr. Hancock were dropped after both Plaintiffs refused to testify against him at trial.

D. Conviction and Post-Conviction Evidence

Plaintiffs were indicted on October 26, 1993. Paterson SUMF ¶ 54. At their respective trials, Mr. Kelley and Mr. Lee attempted to suppress their confessions as involuntary but those motions were denied. PSAMF ¶ 174. Mr. Lee's motion to suppress the photo identification by Ms. Paredes was also denied. Lee Compl. ¶ 84, Lee ECF No. 1. On February 7, 1996, a jury acquitted Mr. Kelley of murder, but found him guilty of felony murder, conspiracy, robbery, and possession of a weapon for an unlawful purpose. Kelley Compl. ¶ 86, Kelley ECF No. 1, Lee Compl. ¶ 82. On March 15, 1996, he was sentenced to life in prison with a mandatory 30 years of parole ineligibility. *Id.* On April 10, 1996, Mr. Lee was convicted of murder, felony murder, robbery of the first degree, conspiracy, possession of a weapon. Kelley Compl. ¶ 88, Lee Compl. ¶ 87. Mr. Lee was sentenced to life in prison with a mandatory 30 years of parole ineligibility followed consecutively by 20 years in prison with 10 years of parole ineligibility. *Id.*

Results of the 1993 DNA testing by the FBI of the green plaid hat had been inconclusive. Paterson SUMF ¶ 67. In 2014, additional DNA testing established that Eric Dixon was the habitual wearer of the green plaid hat. *Id.* at ¶ 68. Based on this new

evidence, Mr. Kelley and Mr. Lee moved for a new trial. *Id.* at ¶ 69. The state court granted that application on September 15, 2017, but specifically noted that its decision was "in no way, shape, or form" a finding as to Plaintiffs' innocence which would still need to be determined by a jury. *Id.* at ¶ 70. Thereafter, the State dismissed the indictments and abandoned plans to retry Plaintiffs. *Id.* at ¶ 71.

### E. Procedural History

Mr. Lee filed suit on September 11, 2019, and Mr. Kelley filed suit the next day on September 12, 2019. Each of the Defendants has crossclaims against the other Defendants for contribution and indemnification. On July 1, 2020, Defendants' motions to dismiss were denied except as to the claims Plaintiffs agreed to dismiss—the state law malicious prosecution claim against Paterson and claims against Defendants Richard Munsey and Vincent Anoresano. July 1, 2020 Op., Kelley ECF No. 81, Lee ECF No. 68. The cases were consolidated for discovery purposes only. Oct. 24, 2019 Order, Kelley ECF No. 10, Lee ECF No. 12.

### F. Defendants

**Reyes** was the lead detective on the investigation. He received and reviewed all handwritten notes, including those taken by other officers, and compiled it into a typewritten report. PSAMF ¶ 107; Reyes Dep. 129:11-130:7. The PPD Report omits Mr. Thompsons' exculpatory statement. PSAMF ¶¶ 103-106, 108. During Mr. Kelley's interrogation, Reyes told Mr. Kelley that he would be allowed to go home if he gave police the statement they wanted. He and Jordan also witnessed Sgt. Stell hitting Mr. Kelley. Reyes was present for the entirety of Mr. Kelley's admissions. *Id.* at ¶ 31. Although Reyes disputes being involved in Mr. Lee's interview, Plaintiffs contend that during Mr. Lee's interrogation, Reyes informed Stell that Mr. Kelley had confessed and what he purportedly said; Stell then told Iurato and Nieves of Kelley's confession. Pls. Resp. to Reyes SUMF ¶ 6, Kelley ECF No. 236, Lee ECF No. 210; Jordan SUMF at ¶ 2o; PSAMF ¶ 59. Reyes did not disclose to prosecutors the scripted handwritten version of Mr. Lee's confession.

**Sgt. Stell** was the supervisor in charge of the murder investigation and closely monitored the interrogations. PSAMF ¶ 169. He participated in the interview and confession of Mr. Kelley. Stell Stmt. Of Material Facts (Stell SUMF) ¶ 1, Kelley ECF No. 220, Lee ECF No. 237. Sgt. Stell struck Mr. Kelley on the head with an open hand and threatened bodily harm. PSAMF ¶ 35. While Stell denies participating in Mr. Lee's interview and interrogation, he did go back and forth between the two interrogations. Pls. Resp. to Stell SUMF ¶ 2, Kelley ECF No. 236, Lee ECF No. 210; PSAMF ¶¶ 38, 42.

**Sgt. Reid** and Jordan received the tip from the unknown source. Sgt. Reid denies having had a supervisory role in the investigation because Sgt. Stell was the assigned supervisor. Reid Stmt. Of Undisputed Material Facts (Reid SUMF) ¶ 4, Kelley ECF No. 216-2, Lee ECF No. 192-2. However, Sgt. Reid was Reyes' direct supervisor and reviewed and signed Reyes' PPD Report regarding the investigation and discovery disclosed to the defense. *Id.* at ¶ 19; Pls. Resp. to Jordan SUMF ¶ 4. Sgt. Reid testified that he did not participate in the interrogations of Messrs. Kelley and Lee. Reid SUMF ¶ 16.

7

**Jordan** was assigned certain investigative tasks to assist in Merino's homicide, including collecting clothing, pictures, information, and other evidence related to the investigation. Jordan SUMF ¶¶ 3-6. Jordan and Sgt. Reid received the tip from the unknown source as to the location and identity of the two Black males and a white male observed in front of the video store around the time of the homicide. Jordan was not involved in Mr. Lee's transport to the police station for questioning or his arrest. *Id.* at ¶¶ 13-14. Reyes and Jordan witnessed Sgt. Stell hit Mr. Kelley. Jordan is retired from the PPD. *Id.* at ¶ 25.

**Nieves** accused Mr. Lee of lying, threatened and punched him, and also gestured menacingly toward his gun. Iurato and Nieves signed Mr. Lee's confession statement as witnesses. Nieves only interviewed Mr. Lee and was not involved in Mr. Kelley's interview. Nieves Stmt. Of Material Facts (Nieves SUMF) ¶¶ 5-6, Kelley ECF No. 224, Lee ECF No. 235.

**Iurato** joins in the arguments raised by Reyes and provides no separate statement of facts. Iurato was in Mr. Lee's interview room for the duration of Mr. Lee's typed confession. He and Reyes took Carmen Paredes's statement identifying Mr. Lee in a photo lineup as the man she saw in the video store and then showed Ms. Paredes a second 8-person photo lineup featuring Mr. Kelley whom she could not identify.

**Smith** arrived at the interrogation *after* Mr. Kelley was assaulted and Sgt. Stell and Jordan had left the room, which Plaintiffs have not disputed. Pls. Resp. to Stmt. Of Facts (Smith SUMF) ¶ 11, Kelley ECF No. 236, Lee ECF No. 210. Smith assisted Reyes in taking Mr. Kelley's statement. PSAMF ¶¶ 31, 89. Reyes and Smith signed Mr. Kelley's confession as witnesses, and Stell notarized it. *Id.* at ¶ 98. Smith is retired from the PPD and was not capable of being deposed because he suffers from dementia. Smith SUMF ¶¶ 8-9, Kelley ECF No. 223, Lee ECF No. 198.

**Finer** conducted the interviews of witnesses Felix Nieves and Miguel Victoria, *see* Finer Exs. C and D, Kelley ECF Nos. 217-5, 217-6, Lee ECF Nos. 193-5, 193-6, and authored July 28, 1993 reports containing descriptions of items stolen from the crime scene, *see* Ex. F, Kelley ECF Nos. 217-8, Lee ECF No. 193-8, and a suspect identification, *see* Ex. E, Kelley ECF No. 217-7, Lee ECF 193-7. Finer was in Mr. Kelley's interrogation room when Mr. Kelley purportedly confessed. PSAMF ¶ 31. Just prior to Mr. Kelley's confession, Finer told Mr. Kelley that he would contact his mother to let her know where he was.

**Lt. Clark** reviewed the typed reports during and at the end of the case as well as witness statements after the sergeant reviewed them. *Id.* at ¶ 171. Supplemental reports would be reviewed by the sergeant and then by the lieutenant. *Id.* Stell, Reid, as well as other sergeants would have communicated with Lt. Clark to update him on developments in investigations. *Id.* Lt. Clark did not participate in the interviews of either Mr. Kelley or Mr. Lee, which Plaintiffs have not disputed. Clark Dep. 96:11-16, Clark Ex. A, Kelley ECF No. 218-3, Lee ECF No. 194-3.

**Paterson** is a municipality in New Jersey where store clerk Tito Merino was

murdered on July 28, 1993. Pls. Resp. to Paterson SUMF ¶ 1. At all relevant times, Paterson was the employer of the individual Defendant officers who investigated the homicide. Kelley Compl. ¶ 24, Lee Compl. ¶ 25. Richard Munsey ("Chief Munsey") served as PPD's Chief of Police from approximately May 1990 to January 1995 and has since retired from the department. Pls. Resp. to Paterson SUMF ¶ 2; Munsey Dep. 7:11-14, Pls. Ex. 138, Kelley ECF No. 234-139, Lee ECF No. 208-139. Plaintiffs' claims against Chief Munsey have been dismissed, but he is the final "policymaker" for Paterson in this case for purposes of municipal liability. *See* Kelley Compl. ¶ 22, Lee Compl. ¶ 23; Paterson Mot. 6-7, Kelley ECF No. 225, Lee ECF No. 199; Munsey Dep. 35:2-7, Pls. Ex. 138 (testifying that policymaking for supervision and discipline at the PPD was shared between the Chief of Police and Director of Public Safety).

### G. Twelve Causes of Action

#### 1. Federal Claims Under 42 U.S.C. § 1983

- Deprivation of liberty without due process of law and denial of a fair trial by fabricating evidence and withholding material exculpatory and impeachment evidence against all individual Defendants: <u>Count I for Mr. Kelley</u>, <u>Count II for Mr. Lee</u> includes claim for deliberately failing to conduct a constitutionally adequate investigation

- Malicious prosecution in violation of the Fourth and Fourteenth Amendments against all individual Defendants: <u>Count I for Mr. Lee</u>, <u>Count III for Mr. Kelley</u>

- Violation of right against self-incrimination under the Fifth and Fourteenth Amendments: <u>Count II for Mr. Kelley</u> against Reyes, Stell, Smith, Jordan, and Finer, <u>Count III for Mr. Lee</u>, against Reyes, Stell, Iurato, and Nieves

- Civil rights conspiracy against all individual Defendants: <u>Count IV for both</u>

- Failure to intervene against all individual Defendants: <u>Count V for both</u>

- Supervisory liability against Lt. Clark, Sgt. Stell, and Sgt. Reid: <u>Count VI for both</u>

- Municipal liability against Paterson: <u>Count VII for both</u>

#### 2. New Jersey State Law Claims

- Malicious prosecution against all individual Defendants:[5] <u>Count VIII for both</u>

---

[5] As noted, the Court dismissed Plaintiffs' state law malicious prosecution claim against Paterson. *See* Kelley ECF No. 81, Lee ECF No. 68.

- Intentional infliction of emotional distress against all individual Defendants and Paterson:[6] <u>Count IX for both</u>

- Negligence and gross negligence against all individual Defendants and Paterson: <u>Count X for both</u>

- Negligent supervision and training against Lt. Clark, Sgt. Stell, Sgt. Reid, and Paterson: <u>Count XI for both</u>

- Violation of the New Jersey Civil Rights Act ("NJCRA") against all individual Defendants and Paterson: <u>Count XII for both</u>

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). The moving party bears the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)) (emphasis in original and internal quotation marks omitted). In other words, "unsupported assertions, speculation, or conclusory allegations" are insufficient to defeat a summary judgment motion. *Longstreet v. Holy Spirit Hosp.*, 67 F. App'x 123, 126 (3d. Cir. 2003). "[T]here must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. The Court's role at the summary judgment stage "is 'not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 249). In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587; *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

---

[6] Plaintiffs agreed to drop their intentional infliction of emotional distress claim against Paterson. Pls. Opp. Br. at 51.

## III.   DISCUSSION

The following discussion proceeds in three parts. First, the Court addresses Plaintiffs' § 1983 claims against the individual Defendants ("Part A") before turning to the issue of municipal liability against Paterson ("Part B"). Finally, the Court addresses the series of New Jersey state law claims against both the individual Defendants and Paterson ("Part C").

### A.   <u>42 U.S.C. § 1983 Claims Against the Individual Defendants</u>

*1.  Personal Involvement*

"A defendant in a § 1983 action 'must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.'" *Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 379 (E.D. Pa. 2023) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, [], must be made with appropriate particularity." *Rode*, 845 F.2d at 1207. Hence "a plaintiff alleging that one or more officers engaged in unconstitutional conduct must establish the 'personal involvement' of each named defendant to survive summary judgment and take that defendant to trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 285 (3d Cir. 2018). Section 1983 liability does not attach to an "individual's cohorts who happen to be in the immediate vicinity." *Id.* at 290. "Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir.1995) and *Rode*, 845 F.2d at 1201 n. 6). Rather than argue that there are no genuine issues of material fact to establish the elements of each constitutional violation, each Defendant primarily argues that he had no participation in or knowledge of any wrongdoing.

Because it is undisputed that Lt. Clark did not personally participate in the interviews of either Plaintiff or in the actual investigation of the murder, his potential liability is based solely on his supervisory role in reviewing and signing off on reports and witness statements. *See* discussion below. Thus, Lt. Clark's motion for summary judgment is **granted** on claims except for the civil conspiracy claim in Count IV and the supervisory liability claims in Counts VI and XI of Mr. Kelley and Mr. Lee's Complaints. Whether the alleged conduct of each of the other individual Defendants constitutes personal involvement in the violation of a constitutional violation or is entitled to qualified immunity is addressed below.

11

2. *Qualified Immunity*[7]

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional federal rights, unless they are protected by qualified immunity." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021) (quoting *Santini v. Fuentes*, 795 F.3d 410, 416-17 (3d Cir. 2015)). The qualified immunity analysis is a two-prong inquiry: "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right and (2) whether the law was clearly established at the time of the violation [such that it would have been clear to a reasonable officer that his conduct was unlawful]."[8] *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021); *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020). An answer in the negative to either prong entitles an officer to qualified immunity. *See Reedy v. Evanson*, 615 F.3d 197, 223-24 (3d Cir. 2010). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"'Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right.'" *Donahue v. Gavin*, 280 F.3d 371, 378 (3d Cir. 2002) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir.1997); *see Pearson*, 555 U.S. at 232 (noting that in qualified immunity analysis, court must decide whether "facts that a *plaintiff has ... shown* (see Rules 50, 56) make out a violation of a constitutional right." (emphasis added)). Once the plaintiff carries this initial burden, the movant asserting the affirmative defense of qualified immunity bears the ultimate burden of persuasion on both prongs at the summary judgment stage. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014); *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023).

3. *Deprivation of Liberty without Due Process, Denial of Fair Trial By Fabricating Evidence and Withholding Exculpatory and Impeachment Evidence Against All Individual Defendants (Kelley Count I; Lee Count II includes Failure to Conduct Constitutionally Adequate Investigation)*

---

[7] Qualified immunity under § 1983 and the NJCRA share the same standards. *See Chavarriaga*, 806 F.3d at 222, n.7 ("[t]he defenses and immunities applicable to federal constitutional claims apply with equal force to parallel New Jersey state constitutional claims." (citing *generally* N.J. Stat. Ann. §§ 10:6–1 *et seq.*)); *see also Faragalla v. Jersey City*, No. 17-03604, 2020 WL 5812798, at *12 (D.N.J. Sept. 30, 2020); *Brown v. State*, 230 N.J. 84 (N.J. 2017). Accordingly, the Court need not conduct a separate qualified immunity analysis regarding Count XII, which alleges state-law constitutional claims under the NJCRA.

[8] The individual Defendants' briefs in support of their respective motions are largely underdeveloped and deficient in the recitations of undisputed material facts and relevant law including whether the law was clearly established on the constitutional violation claims at the time of the violation. Nonetheless, the Court endeavors to address both prongs of the qualified immunity analysis because qualified immunity is "'an immunity from suit rather than a mere defense to liability,'" *Pearson*, 555 U.S. at 237, and "in proper cases the court may consider the question of qualified immunity *sua sponte*." *Vorobyev v. Wolfe*, 638 F. Supp. 3d 410, 427 (M.D. Pa. 2022) (citing *Doe v. Delie*, 257 F.3d 309, 312 (3d Cir. 2001) (affirming magistrate judge's *sua sponte* recommendation of qualified immunity)).

a. <u>Suppression of *Brady* materials</u>

The obligation of a police officer to disclose exculpatory materials (a corollary of the prosecution's duty to disclose) was not clearly recognized until 2005 in Gibson v. Superintendent of NJ Dep't of L. & Pub. Safety-Div. of State Police, 411 F.3d 427, 443 (3d Cir. 2005), *overruled on other grounds as recognized by Dique v. N.J. State Police*, 603 F.3d 181, 182 (3d Cir. 2010); *Stokes v. City of Philadelphia*, No. 22-0338, 2023 WL 362006, at \*5 (E.D. Pa. Jan. 23, 2023); *see Hicks v. City of Philadelphia*, No. CV 22-977, 2023 WL 5278713, at \*6 (E.D. Pa. Aug. 16, 2023) (citing cases). In *Gibson*, the Court found that the troopers were entitled to qualified immunity because an officer's affirmative duty to disclose information was not clearly established at the time of the plaintiff's conviction in 1994; in reaching that decision, it observed that "[e]ven in 2000, this Court was only able to *assume* that police officers 'have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists." *Id.* at 444) (emphasis in original) (citing *Smith v. Holtz*, 210 F.3d 186, 197 n. 14 (3d Cir. 2000)). Nonetheless, some courts interpret *Gibson* as holding that a police officer's obligation to disclose exculpatory materials was established in 1995 with the Supreme Court's decision in *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).[9] *See e.g., Pierre v. Treasury Dep't*, No. 18-3443, 2019 WL 2121369, at \*6 (D.N.J. May 14, 2019). Given that courts disagree whether an officer's duty to disclose exculpatory evidence was established in 1995 by *Kyles* or in 2005 by *Gibson*, the Court cannot conclude that an officer's obligation to disclose exculpatory materials was clearly established at the time of Plaintiffs' convictions in 1996. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 639 (3d Cir. 2015) (noting clearly established right requires that "existing precedent must have placed the statutory or constitutional question *beyond debate*." (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Even if an officer's duty to disclose was clearly established by 1996, the facts alleged by Plaintiffs fail to show that Defendants' conduct rose to the level of a constitutional violation. Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." As defined by the Supreme Court, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The "reasonable

---

[9] In *Kyles,* the Court stated that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" and settled the matter of whether evidence held by the police could be imputed to the prosecutor; it did not address the "related duty of the police to disclose information to the prosecutor" which was "not widely addressed until later." *Gibson*, 411 F.3d at 444 (discussing *Kyles*, 514 U.S. at 437).

probability" standard does not require "demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* at 434. Rather, a "reasonable probability" of a different result is when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 434-35. Suppressed evidence is to be "considered collectively, not item by item." *Id.* at 436. The Constitution does not demand "an open file policy." *Id.* at 437. This leaves the government with a "degree of discretion" and a "corresponding burden" to make disclosure when "reasonable probability" is reached. *Id.*

The favorable evidence that Plaintiffs allege was deliberately suppressed includes: 1) "Ralph" was crossed out in Sgt. Reid's notes of the tip from the confidential source; 2) Mr. Kelley, whose initials are "EK" rather than "KC," did not have a scratch on his face and he was not wearing a gray top as described by the unknown source at the time Reid stopped Mr. Kelley; 3) Carmen from Bob's Supermarket told Sgt. Reid that it was three white men who tried to sell her a VCR; 4) Thompson commented to Reyes that he did not know the perpetrator but recognized Plaintiffs from the neighborhood. The Court cannot conclude that even cumulatively, this evidence is so favorable that a jury could conclude there to be a "reasonable probability" of a different result because the suppressed evidence puts the whole case in such a different light as to undermine confidence in the outcome of the trial. A constitutional violation does not occur every time any evidence helpful to the defense is not disclosed. *Smith*, 210 F.3d at 196. Even if Sgt. Reid and Reyes should have disclosed such evidence under *Brady*, there are no facts in dispute to suggest that Jordan, Stell, Nieves, Iurato, Smith, or Finer were personally involved in suppressing any material exculpatory evidence.

The individual Defendants are entitled to summary judgment as a matter of law and based on qualified immunity with regard to their failure to inform the prosecutor of exculpatory material under *Brady*. Summary judgment is **granted** as to that claim in Count I of Mr. Kelley's Complaint and on Count II of Mr. Lee's Complaint.

### b.  Fabrication of Evidence

It is well settled that the denial of a fair trial by fabricating evidence violates clearly established constitutional rights to due process. *See Halsey*, 750 F.3d at 294 (finding to be clearly established by 1985 stand-alone Fourteenth Amendment claim under § 1983 for fabrication of evidence "if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted" at trial). A claim for fabrication of evidence requires a plaintiff to demonstrate "that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case" in which he was convicted. *Id.* at 295 (footnote omitted). In addition to this causation requirement, "testimony that is incorrect or simply disputed" is not fabricated "merely because it turns out to have been wrong." *Id.* To defeat summary judgment, a plaintiff must offer

"persuasive evidence" of "bad faith," that is, that Defendants "formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth." *Mervilus v. Union County*, 73 F.4th 185, 194-95 (3d Cir. 2023). "Because this intent requirement is stringent, 'it will be an unusual case in which a police officer cannot obtain summary judgment in a civil action charging him with having fabricated evidence." *Id.* at 194 (citing *Halsey*, 750 F.3d at 295). An "'inference' of fabrication 'based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment." *Scott Brasher v. New Jersey State Park Police*, No. 20-01351, 2025 WL 342071, at *13 (D.N.J. Jan. 30, 2025) (citing *Brackbill v. Ruff*, No. 22-1628, 2023 WL 5447271, at *3 (3d Cir. Aug. 24, 2023)).

At the outset, there can be no dispute that the confessions were of such significance that it could have affected the outcome of Plaintiffs' criminal trials. Notably, any facts that may support a *coercion* claim against Stell, Jordan, Reyes, or Nieves, *see* discussion below, do not create an inference that those Defendants *fabricated* the confessions. *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022) ("there is a difference between fabricated evidence, which is necessarily untrue, and evidence obtained through coercion, which may be true."). As evidence of fabrication, Plaintiffs note that Mr. Kelley's confession included nonpublic information (*e.g.,* the green and purple plaid hat worn by the perpetrator) and details that were never corroborated (*e.g.,* the existence of a bloody rag, the location where the murder weapon was disposed of, or where the stolen items could be found). Plaintiffs also conclude that Reyes and Smith created Mr. Kelley's written confession and that Iurato and Nieves did so for Mr. Lee, *see* PSAMF ¶ 263c, presumably because they typed up the statements or signed as witnesses. Plaintiffs also speculate, without citing supporting evidence in the record, that the handwritten version of Lee's confession is in Nieves' handwriting and "obviously created" and fed to Mr. Lee to match Mr. Kelley's confession. *See* Pls. Resp. to Jordan's SUMF, ¶ 2q. While Plaintiffs do not allege that the witness statements or reports completed by Finer were fabricated, they do claim that Ms. Paredes' identification of Mr. Lee was also incorrect and thus fabricated. As evidence, Plaintiffs highlight that Ms. Paredes was shown a second photo lineup despite having identified Mr. Lee and reported seeing only one Black man in the video store.

Assuming the confessions and Ms. Paredes' identification were false, Plaintiffs have not shown that each Defendant personally participated in the formulation or submission of evidence he knew was fabricated and did so with the requisite bad intent. *See e.g.,* PSAMF ¶ 55 (Kelley testified that "they" fed him information). Even if, for instance, Reye, Smith, Iurato, and Nieves, by typing up the confessions and writing out the handwritten confession, had personal involvement in creating false evidence, there is no "persuasive evidence" that each Defendant knew the confessions were fabricated and formulated or submitted them willfully, knowingly, or with a reckless disregard for truth or that Iurato and Reyes "were aware that [Ms. Paredes'] identification was incorrect, and thus, in effect, offered the evidence in bad faith." *See Halsey*, 750 F.3d at 295. Likewise, Plaintiffs have not identified persuasive evidence, or even *any* evidence, that shows that Sgt. Reid and

Jordan formulated and submitted a false tip from the confidential source knowing it was false and did so with the requisite intent.

Viewing all evidence in its totality and construing reasonable inferences in Plaintiffs' favor as the Court must, no genuine issues of material facts exist upon which a reasonable jury could find that each of the individual Defendants had personal involvement in formulating and submitting fabricated evidence willfully, knowingly, or with reckless disregard for its truth. Based on the same fact issues, the individual Defendants are also entitled to qualified immunity on this claim. Thus, summary judgment is **granted** as to the § 1983 fabrication of evidence claim in Count I of Mr. Kelley's Complaint and Count II of Mr. Lee's Complaint.

### c. Constitutionally Inadequate Investigation

No recognized constitutional right to an "adequate" investigation existed in 1996. *See Handy v. City of Philadelphia*, No. 24-1905, 2024 WL 4309973, at *5 (E.D. Pa. Sept. 26, 2024) ("Courts in this district have consistently held that there is no constitutional right to a police investigation, let alone one that meets some threshold of "adequacy," and no such right was clearly established during the relevant period of 2011 to 2013." (citing *Thomas v. City of Phila.*, 290 F. Supp. 3d 371, 386 (E.D. Pa. 2018) and *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 332 n.3 (E.D. Pa. 2017)); *Murphy v. Middlesex County*, 361 F. Supp. 3d 376, 391 (D.N.J. 2019). The individual Defendants have qualified immunity on Mr. Lee's inadequate investigation claim in Count II.

### 4. *Malicious Prosecution in Violation of Fourth and Fourteenth Amendments*[10] *Against All Individual Defendants (Kelley Count III; Lee Count I)*

### a. Fourteenth Amendment Malicious Prosecution Claim

Between 1993 and 1996 when Plaintiffs were interrogated and convicted, a Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established. *Compare Torres v. McLaughlin*, 163 F.3d 169, 173 (3d Cir. 1998) ("we do not read *Albright [v. Oliver,* 510 U.S. 266 (1994)] to hold that a malicious prosecution claim can only be based in a Fourth Amendment violation."), *with Gallo v. City of Philadelphia,* 161 F.3d 217, 222 (3d Cir.1998) (interpreting *Abright* to imply that malicious prosecution claim must show deprivation of liberty consistent with Fourth Amendment "seizure"). *See also Halsey,* 750 F.3d at 291, n.14 (declining to decide viability of malicious prosecution under Fourteenth Amendment as plaintiff had abandoned

---

[10] The boundary between Fourth and Fourteenth Amendment claims is temporal: the Fourth Amendment's protection against unlawful seizure without probable cause extends only until trial in contrast to the guarantee of due process which "protects defendants during an entire criminal proceeding through and after trial." *Halsey,* 750 F.3d at 291.

that claim but noting comparison of *Torres* and *Gallo*); *see, e.g., Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 267 (E.D. Pa. 2022) (concluding that individual defendants were entitled to qualified immunity because between 1992 and 1996, "it was not clearly established that the Fourteenth Amendment provided for a procedural due process right against malicious prosecution"). Even by 2020, "[a]s reflected in *Gallo, Torres, and Halsey*, there was, and continues to be, confusion amongst lower courts about how the Supreme Court's decision in Albright impacts the ability to maintain a malicious prosecution claim based on the right to procedural due process guaranteed by the Fourteenth Amendment." *Lewis v. City of Philadelphia*, No. CV 19-2847, 2020 WL 1683451, at *8 (E.D. Pa. Apr. 6, 2020). *But see Crosland v. City of Philadelphia*, 676 F. Supp. 3d 364, 376-77 (E.D. Pa. 2023) (rejecting qualified immunity as to Fourth Amendment malicious prosecution claim because criminal charges must be based on probable cause and no reasonable officer could have thought otherwise). Following the majority of decisions in the Third Circuit, the Court finds that Fourteenth Amendment procedural due process right against malicious prosecution was not clearly established at the time of the violation and therefore, all individual Defendants are entitled to qualified immunity on that claim.

b.  Fourth Amendment Malicious Prosecution Claim

The right to be free from malicious prosecution under the Fourth Amendment, however, was clearly established at the time of the violation and contains five elements: (1) a defendant initiated a criminal proceeding against the plaintiff; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007). The elements of tort claim for malicious prosecution under New Jersey are substantially the same except that it does not require proof of the last element (deprivation of liberty). *See Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 393–94 (2009) (citing *Helmy v. City of Jersey City*, 178 N.J. 183, 190 (2003)).

Nieves and Reyes argue that Plaintiffs cannot satisfy each of these elements of malicious prosecution. The Court disagrees. First, contrary to their contention that they did not initiate criminal proceedings against Plaintiffs, "[i]f the officers influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." *Halsey*, 750 F.3d at 297. Sgt. Stell, Nieves, Jordan, and Reyes arguably influenced or participated in the decision to institute criminal proceedings by obtaining what a jury could find were coerced confessions, *see* discussion below. *See* Nieves Dep., 91:9–92:8, Pls. Ex. 142, Kelley ECF No. 234-143, Lee ECF No. 208-143. Second, the Court has previously ruled that the criminal proceedings against Plaintiffs ended in their favor, *see* July 1, 2020 Op. at 7. Third, a reasonable jury could conclude that the arrests lacked probable cause because Sgt. Stell, Nieves, Jordan, and Reyes coerced

Plaintiffs' confessions. Fourth, contrary to Nieves' and Reyes' contention that Plaintiffs cannot prove the element of malice, "'malice may be inferred from lack of probable cause.'" *Evans v. City of Newark*, No. 14-00120, 2023 WL 2535283, at *18 (D.N.J. Mar. 16, 2023) (citing *Morales v. Busbee*, 972 F. Supp. 254, 261 (D.N.J. 1997). Consequently, Plaintiffs were clearly deprived of liberty. Summary judgment is **denied** as to Sgt. Stell, Nieves, Jordan, and Reyes on the Fourth Amendment malicious prosecution claim in Count III of Mr. Kelley's Complaint and Count I of Mr. Lee's Complaint.

However, evidence that Finer, Smith or Iurato were present in the interrogation room at some point, that Smith and Iurato typed up the confessions, or that Sgt. Reid investigated the tip from the confidential source is insufficient to establish that each of those Defendants influenced or participated in the decision to institute criminal proceedings or that they were involved in initiating the criminal proceeding without probable cause. Thus, Finer, Smith, Iurato, and Sgt. Reid are entitled to summary judgment based on qualified immunity and as a matter of law with regard to the malicious prosecution claim under the Fourth Amendment.

### 5. Right Against Self-Incrimination Under Fifth and Fourteenth Amendments (Kelley Count II against Reyes, Stell, Smith, Jordan, and Finer; Lee Count III against Reyes, Stell, Iurato, and Nieves)

"[A]n involuntary confession may result from psychological, as well as physical, coercion.'" *Halsey*, 750 F.3d at 303 (citing *Miller v. Fenton*, 796 F.2d 598, 603 (3d Cir. 1986)). A coercion inquiry requires a court to exam the totality of circumstances and "'consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused.'" *Id.* (citing *Miller*, 796 F.2d at 604). That inquiry can include consideration of the accused's youth, lack of education or low intelligence, lack of advice to the accused of his constitutional rights, length of detention, repeated and prolonged nature of questioning, and the use of physical punishment such as food or sleep deprivation. *Id.* at 303 (citing *Miller*, 796 F.2d at 604). The "ultimate question" that the Court should consider is "'whether the defendant's will was overborne when he confessed.'" *Id.* at 304 (citing Miller, 796 F.2d at 604). Plaintiffs must also point to "some link between police misconduct and the confession." *Id.* at 303 (citing *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005)).

### a. Kelley Complaint Against Reyes, Stell, Smith, Jordan, and Finer

Plaintiffs have identified material facts in dispute that if believed by a jury could support their claims that their confessions were coerced. Mr. Kelley claims that Sgt. Stell hit him, that Jordan and Reyes witnessed it (thus acquiescing in the coercion), and that Reyes made promises to Mr. Kelley that he could go home if he confessed. Based on these fact issues, including Mr. Kelley's cognitive limitations, severe heroin addiction, and officers' repeated insistence that he was lying, a jury could conclude that Sgt. Stell, Jordan,

and Reyes crossed the line between permissible police conduct and unconstitutional coercion. Summary judgment is **denied** as to Reyes, Stell, Jordan on Count II of Kelley's Complaint.

However, the allegation that Finer told Mr. Kelley that he would let Mr. Kelley's mother know where he was, viewed in the light most favorable to Plaintiffs, is an insufficient basis for a reasonable factfinder to conclude that Finer personally participated in, had actual knowledge of, and acquiesced in coercing Mr. Kelley's confession. As for Smith, it is undisputed that he arrived at Mr. Kelley's interrogation *after* the alleged assault occurred. Furthermore, that Smith assisted Reyes in memorializing Mr. Kelley's statement does not demonstrate that he was personally involved in coercing Mr. Kelley's confession. *See e.g., Handy*, 2024 WL 4309973, at *4 (noting that "mere allegation that Jenkins was in the back of the interrogation room on his phone" during a coerced confession "does not permit the inference that Jenkins participated in that coercion or later submitted that confession to the prosecution."). Because there are no genuine issues of material fact for a jury to find that Finer or Smith participated in coercing Plaintiffs' confessions, they are entitled to qualified immunity and to judgment as a matter of law. Summary judgment is **granted** as to Finer and Smith on Count II of Kelley's Complaint.

### b. Lee's Complaint Against Reyes, Stell, Iurato, and Nieves

Mr. Lee's sworn statement that officers, including Nieves, beat him and repeatedly told him he was lying is sufficient for a jury to possibly find that Nieves participated in violating Mr. Lee's constitutional rights. Sgt. Stell allegedly went back and forth between the two interrogations, was present when Mr. Lee repeatedly proclaimed his innocence, and he and other officers informed Mr. Lee of the "bits of information" from Mr. Kelley to convince Mr. Lee that they knew of his participation in the murder. PSAMF ¶ 59; Stell Dep. 52:5-19, Pls. Ex. 151, Kelley ECF No. 234-152, Lee ECF No. 208-151. Reyes was the lead investigator, witnessed hitting Mr. Kelley, and gave Sgt. Stell a full briefing of Mr. Kelley's confession. PSAMF ¶ 59. Viewing all evidence in its totality including Mr. Lee's cognitive limitations and heroin addiction, it is reasonable to infer that Reyes and Sgt. Stell knew of and acquiesced in the coercion of Mr. Lee's confession. In contrast, although Iurato was in the interview room typing up Mr. Lee's statement, that fact does not demonstrate that Iurato personally participated in or had *actual* knowledge and acquiesced in directly violating Plaintiffs' constitutional rights against self-incrimination. Thus, summary judgment on Count III of Mr. Lee's Complaint is **denied** as to Reyes, Nieves, and Stell because they are not entitled to qualified immunity and because there are genuine issues of material fact to be resolved by a jury. Summary judgment is **granted** as to Iurato on the coercion claim.

### 6. *Civil Rights Conspiracy Against All Individual Defendants (Both Counts IV)*

A civil rights conspiracy claim requires that a plaintiff "prove that persons acting

19

under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Jutrowski*, 904 F.3d at 293–94 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). Plaintiffs "'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'" *Id.* at 295 (citing *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184–85 (3d Cir. 2009)). "To show agreement, he must demonstrate that the state actors named as defendants in the [ ] complaint somehow reached an understanding to deny [the plaintiff] his rights, and in the absence of direct proof, that 'meeting of the minds' or 'understanding or agreement to conspire' can be inferred from circumstantial evidence." *Id.* (cleaned up, internal citations omitted). "Because 'inferring mental state from circumstantial evidence is among the chief tasks of factfinders,' [citation omitted], an allegation of conspiracy can only be overcome at summary judgment when 'the moving parties' submissions foreclose[ ] the possibility of the existence of certain facts from which" a jury could infer that there had been a meeting of the minds." *Id.* (citing *Anderson*, 477 U.S. at 249). "To defeat summary judgment, a plaintiff need only point to circumstantial evidence of an agreement and concerted action" such as distorted stories in police reports. *Sanders v. Jersey City*, No. 18-01057, 2021 WL 1589464, at *21 (D.N.J. Apr. 23, 2021) (citing *Jutrowski*, 904 F.3d at 295).

Here, Defendants have not foreclosed the possibility of the existence of certain facts from which a jury could infer that Jordan, Stell, Nieves, Reyes, as well as Sgt. Reid and Lt. Clark as supervisors, had a meeting of the minds and acted to deprive Plaintiffs of their constitutional rights against malicious prosecution and self-incrimination. Summary judgment on the claim for civil conspiracy is **denied** as to those Defendants. However, because no underlying claims remain against Finer, Smith, and Iurato, summary judgment is **granted** as to those Defendants on the conspiracy count.

### 7. *Failure to Intervene in Violation of Fourth and Fourteenth Amendments Against All Individual Defendants (Both Counts V)*

Plaintiffs allege that Defendants "had opportunities to intervene on behalf of [Mr. Kelley and Mr. Lee] to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but with deliberate indifference declined to do so," and that such failures violated their "constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments." Kelley Compl. ¶¶ 157-158; Lee Compl. ¶¶ 155-156.

A police officer's duty to intervene is clear in the Eighth Amendment excessive force context. *See El*, 975 F.3d at 335; *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2020) ("a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior."). However, "[c]ourts in this district have consistently held that there is no clearly established

stand-alone right to intervention by officers to prevent malicious prosecution or deprivation of liberty without due process, and no such right was clearly established during 2011 and 2013."). *Handy*, 2024 WL 4309973, at *6; *Onyiah v. City of Phila.*, 660 F. Supp. 3d 407, 416 (E.D. Pa. 2023) ("we find that there is simply no pervasive authority on which we could conclude that [police officers] had a clearly established duty to intervene to prevent [p]laintiff's coerced confession or malicious prosecution."); *Maldonado v. City of Philadelphia*, No. 22-3474, 2023 WL 4685967, at *9 (E.D. Pa. July 21, 2023) (noting Third Circuit has not "extended failure-to-intervene liability to, for example, a state actor if he observes or has reason to know of a false arrest and has a realistic opportunity to intervene." (cleaned up) (citing *Lozano v. New Jersey*, 9 F.4th 239, 246 n.4 (3d Cir. 2021)). Thus, the individual Defendants are entitled to qualified immunity on the failure to intervene claim. Summary judgment is **granted** as to Count V.

### 8. *Supervisory Liability Against Clark, Stell, and Reid (Both Counts VI)*

Plaintiffs contend that Sgts. Stell and Reid were both personally involved in the investigations and that Stell, Reid, and Lt. Clark directly supervised the investigative acts taken by the PPD detectives on the murder case. A supervisor may be personally liable under § 1983 for a subordinate's unconstitutional acts is "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004). Liability based on a claim that supervisors directed others to violate constitutional rights necessarily requires an "actual violation at the hands of subordinates" as well as a "causal connection between the supervisor's direction and that violation, or, in other words, proximate causation." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). Another theory under which supervisory liability may attach is where the official "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K.*, 372 F.3d at 586 (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)); *Neals v. Stromberg*, No. 16-7141, 2020 WL 5088226, at *16 (D.N.J. Aug. 28, 2020) ("failure to train" claims are generally considered subcategory of "policy or practice liability").

Given that Sgt. Stell was in charge of the murder investigation and evidence that he struck Mr. Kelley, Stell is not entitled to qualified immunity or to summary judgment on Mr. Kelley's claim for § 1983 supervisory liability based on the participation theory of supervisory liability. In addition, there are fact issues that preclude summary judgment under the alternate theory of supervisory liability - that Clark, Stell, and Reid acted recklessly and with deliberate indifference to Plaintiffs' constitutional rights by failing to adequately train, supervise or discipline the other Defendant detectives. Specifically, Plaintiffs contend that supervisors did not identify and follow up on concerns or red flags such as the absence of a formal statement from the witness, Mr. Thompson, that Carmen Paredes's statement was taken on August 4th after she made a photo identification rather

than on July 28th or 29th, or the existence of a handwritten version of Mr. Lee's confession. *See* PSAMF ¶ 172. These are triable issues of material fact precluding summary judgment on the supervisory liability claim.

### B. Municipal Liability Against Paterson (Both Counts VII)

Plaintiffs seek to hold Paterson liable for the constitutional violations by its PPD officers. Asserting a *Monell* claim against the City under § 1983, Plaintiffs contend that Paterson failed to curb rampant police misconduct that fostered a departmental "culture of impunity," which, in turn, empowered the individual Defendants to violate Plaintiffs' civil rights without fear of repercussion. *See generally* Kelley Compl., Lee Compl.

Municipalities may be sued for depriving someone of their constitutional rights, but are not subject to *respondeat superior* liability under § 1983. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978). Instead, the municipality must itself have precipitated the alleged violation. While a finding of municipal liability does not depend on the liability of any one police officer, *see Fagan v. City of Vineland*, 22 F.3d 1283, 1292–93 (3d Cir. 1994), a *Monell* claim does require a violation of the plaintiff's constitutional rights. *Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 126 (3d Cir. 2007). Plaintiffs have identified material facts in dispute that support the contention that their confessions were coerced by certain PPD officers who violated their right against self-incrimination and malicious prosecution. *See* Part A *supra*. As relevant to the *Monell* analysis, the following claims survive:

- Malicious prosecution under the Fourth Amendment (Count I for Mr. Lee against Sgt. Stell, Nieves, Jordan, and Reyes; Count III for Mr. Kelley against Sgt. Stell, Nieves, Jordan, and Reyes); and

- Self-incrimination under the Fifth Amendment (Count III for Mr. Lee against Sgt. Stell, Reyes, and Nieves; Count II for Mr. Kelley against Sgt. Stell, Reyes, and Jordan).

A *Monell* claim can proceed in two ways. "A plaintiff may put forth [1] that an unconstitutional policy or custom of the municipality led to his or her injuries, or [2] that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up) (citing *Est. of Roman v. City of Newark*, 914 F.3d 789-99 (3d Cir. 2019) and *Monell*, 436 U.S. at 694). Plaintiffs advance arguments under both frameworks. They allege that, during the 1980s and 1990s, PPD had a pattern, practice, and custom of police misconduct and, relatedly, a pattern, practice, and custom of failing to take appropriate corrective actions against officers who engaged in misbehavior. Kelley Compl. ¶¶ 124-125, 167, Lee Compl. ¶¶ 122-123, 165; Pls. Opp. Br. 47-49. As for "failure-or-inadequacy," Plaintiffs contend that Paterson's failure to train, supervise, and discipline its officers reflects deliberate

indifference to the "obvious possibility that PPD officers would and in fact did violate the constitutional rights of [Plaintiffs] and many Paterson residents." Kelley Compl. ¶¶ 125, 168, Lee Compl. ¶¶ 123, 167. As the Court previously observed, these avenues are distinct.[11] *See* July 1, 2020 Op., Kelley ECF No. 81, Lee ECF No. 68. A plaintiff alleging that a policy or custom led to their injuries must reference an unconstitutional policy or custom, while the failure to supervise, train, or discipline requires that the said failure amounts to deliberate indifference to the rights of those affected. *Forrest*, 930 F.3d at 106.

### 1. *Plaintiffs' Evidence*

Plaintiffs produced various evidence to establish PPD's culture of impunity that led to the constitutional violations alleged in the Complaints.

### a. Police Misconduct Documented in Newspaper Articles

Plaintiffs submitted a compendium of newspaper articles that, at the very least, paint a picture of rampant police misconduct at the PPD in the years leading up to and following the Merino murder investigation. A common theme emerges from these chronicles: recurrent excessive force against citizens as well as brutality often directed at persons of color. In 1985, *The Record* reported separate incidents in which white PPD officers used unprovoked violence against two Black citizens: a high school student and a New Jersey transit bus driver. Pls. Ex. 183. The student was allegedly beaten so severely during his arrest that he nearly lost an eye and had to spend ten days in the hospital. *Id.* That year, the newspaper published a story about two PPD officers who arrested a man for possessing a small quantity of marijuana and, after hauling him to the station, beat him so severely that they broke one of his legs. Pls. Ex. 184. By 1987, *The Record's* editorial board observed that "[i]nstances of 'excessive force'…are so common in Paterson that they've become a part of the city's fabric." Pls. Ex. 179. The board resolved that it was "high time an outside agency looked at the pattern of abuse that has been paid little more than lip service by local officials." *Id.* Two years later, in 1989, the same board bemoaned that "[d]espite dozens of [misconduct] cases, city officials have been reluctant to rein in [PPD] officers who injure citizens by force or abuse them with racial epithets." Pls. Ex. 180. The board further observed that Paterson officials "have refused for years to even concede that a problem exists." *Id.* As reported by *The Record*, between 1987 and 1995, more than 17 separate federal civil rights suits alleging police brutality were filed against Paterson and ultimately settled. Pls. Ex. 187.

### b. PPD's "Culture of Impunity"

Plaintiffs also furnished evidence to establish PPD's persistent practice of tolerating

---

[11] The Third Circuit has acknowledged the close relationship between a "custom" claim and a "failure-or-inadequacy" claim, and the inevitable "evidentiary overlap" on a motion for summary judgment. *See Forrest*, 930 F.3d at 106.

police misconduct or at least failing to address it in a meaningful way. Representative examples include:

- *Bribery Scandal.* Around 1990, a federal investigation uncovered that high-ranking PPD officers accepted bribes from organized crime outfits. PSAMF ¶ 206. When asked about whether this matter reflected a "breakdown in supervision," Chief Munsey testified that it did. Munsey Dep. 33:15-22, Pls. Ex. 138. Chief Munsey further stated that there had been "several" high-profile scandals at the PPD by the time he took over the department in 1990 and noted that he needed to "keep tabs on what the press was reporting about allegations of police corruption" in order to effectively do his job. *Id.* at 57:10-20. When asked what systemic changes were implemented following the arrests of the delinquent PPD officers, Chief Munsey testified that he recruited new personnel—at least 22 new detectives, with a focus on hiring persons of color—and transferred existing officers from the problematic unit to another department. *Id.* at 34:1-14.

- *Michael Fostok.* In May 1991, Michael Fostok—then Bakri Fostok—was a 19-year-old Lebanese immigrant residing in Paterson when he learned he had an unpaid animal-control ticket related to walking an unleashed dog. PSAMF ¶ 199. Plaintiffs submitted a declaration of Fostok, executed on June 6, 2024, recounting the incident. *See* Fostok Decl., Pls. Ex. 185.[12] When Fostok arrived at the station to handle the matter, he was subjected to intense harassment and brutality by PPD officers. *Id.* After Fostok identified himself, the officers mocked his name and Middle Eastern background. *Id.* at ¶ 5. The encounter escalated, and the officers needlessly handcuffed Fostok, took his mugshot, and threw him in a jail cell. *Id.* at ¶ 6. Fostok was allegedly beaten by an officer, who punched him so hard in the face—while fellow officers watched—that Fostok needed stitches (his request for medical treatment at the station was denied). *Id.* ¶¶ 7-11. After the incident, Fostok filed a complaint against the offending officers with PPD's Internal Affairs unit. *Id.* ¶ 13. Internal Affairs never interviewed Fostok, and as far as he is aware, the officers were never disciplined. *Id.* In 1993, Fostok filed a civil rights suit against the officers, and Paterson offered him a settlement to dismiss the case. *Id.* ¶ 14.

- *Bakery Beating.* In January 1993, six months prior to the Merino murder, three PPD officers were indicted by a Passaic County grand jury for beating a citizen suspected of breaking into a bakery truck, rupturing his spleen, and then attempting to cover up the incident by falsifying police reports. PSAMF ¶ 214 (citing a contemporaneous news article about the matter submitted by Plaintiffs as Exhibit 88). The officers allegedly hauled the suspect to a remote area behind the bakery, where the store owner could hear the suspect screaming. *Id.* The store owner, who witnessed the individual curled in a fetal position on the floor, had to

---

[12] The incident is also described in both Plaintiffs' Complaints and in a produced news article. *See* Pls. Ex. 186.

intervene to stop the assault. *Id.* Chief Munsey suspended only the officer accused of the assault, not the two officers who observed the beating, purportedly did nothing to stop it, and falsified subsequent incident reports. *Id.* They remained on active duty. *Id.* According to Paterson's Rule 30(b)(6) witness, Louis Lawrence Spagnola, had the incident occurred today, all three officers would be suspended automatically for 30 days and then placed on administrative leave. Spagnola Dep. 157:19–160:9, Pls. Ex. 175.

- *Kenneth Eatman.* That same year, two PPD officers attacked a substitute teacher named Kenneth Eatman who came to the station to file a report regarding a minor accident. PSAMF ¶ 209 (citing a contemporaneous news article about the incident submitted by Plaintiffs as Exhibit 188). Eatman was allegedly listening to music on headphones while he waited at the station. Kelley Compl. ¶ 117, Lee Compl. ¶ 115. After someone complained that the music was too loud, the situation escalated, and officers allegedly attacked Eatman, pushing him down a set of stairs and punching him in the face. PSAMF ¶ 209. Internal Affairs claimed to have investigated the matter, but the assigned investigator never spoke to the numerous witnesses who corroborated Eatman's story. *Id.* When a journalist questioned the investigator about the inquiry, the investigator stated about the witnesses: "They know where I am. If they want to be witnesses, they can come find me. I don't know where they are." *Id.* (citing a contemporaneous news article about the incident submitted by Plaintiffs as Exhibit 190). During his deposition, Chief Munsey testified that, if true, the assault "would be extraordinarily serious police misconduct." Munsey Dep. 126:13–23, Pls. Ex. 138. Munsey also stated that he had "no qualms" about how the investigation unfolded. *Id.* at 132:18-24. Paterson stated that, if the allegations are true, the investigation procedure would not be acceptable. Spagnola Dep. 109:1-2, Pls. Ex. 175.

- *Other Incidents Reflecting Alleged Disciplinary Failures.* In 1990, three white PPD officers were charged with beating two teenagers of color in a parking lot. PSAMF ¶ 217 (citing a news article about the incident submitted by Plaintiffs as Exhibit 92). A full Internal Affairs investigation of the incident did not occur, but Paterson admitted that one should have transpired. Spagnola Dep. 191:2–5, 203:1–5, Pls. Ex. 175. In 1991, an officer drunkenly drove his patrol car into an 18-year-old civilian's car, lied about it, and falsely blamed the teenager. PSAMF ¶ 211 (citing a contemporaneous news article about the incident submitted by Plaintiffs as Exhibit 85). Even though New Jersey automatically revoked the officer's driver's license, Chief Munsey did not suspend him or commit to bringing any disciplinary charges. *Id.* Paterson admitted that, today, the officer would be removed from any proactive position. Spagnola Dep. 131:11–135:25, Pls. Ex. 175. A year later, in 1992, a PPD officer was indicted and charged with counts of theft by deception. PSAMF ¶ 212 (citing a contemporaneous news article about the incident submitted by Plaintiffs as Exhibit 86). Following the indictment, Chief

Munsey stated at the time that there were no plans to charge the officer with official misconduct or implement a suspension since the crime was not committed while she was working in her official capacity as a police officer—even though the victim was a fellow officer. *Id.*; *see* Munsey Dep. 137:18–138:18, Pls. Ex. 138.

### c.  The Individual Defendants

Plaintiffs produced evidence indicating at least one of the individual Defendants engaged in allegedly tolerated misconduct while on the job. Plaintiffs also point to facts possibly demonstrating a blue code of silence among some individual Defendants outside the context of the Merino murder investigation.

In 1991, for example, Detective Iurato was accused of pointing his service weapon at a civilian during a traffic stop. PSAMF ¶ 244; Iurato Dep. 105:3–110:24, Pls. Ex. 145. PPD never investigated the incident, even though Iurato was charged with assault (the case was ultimately dismissed), and he continued to interact with civilians and carry a gun. *Id.* Lt. Clark, Iurato's superior, claimed he never had knowledge of this incident, testifying that he was possibly on vacation when it happened. Clark Dep. 187:10–189:8, Pls. Ex. 140. Further, in 1996, Iurato worked as a private investigator in violation of departmental policy. PSAMF ¶ 245 (citing a contemporaneous news article about the incident submitted by Plaintiffs as Exhibit 105). Iurato allegedly misled his superiors, who believed he was conducting sanctioned security work, not investigative matters. *Id.* Paterson stated that an Internal Affairs investigation should have occurred to determine whether Iurato intentionally misled the PPD about the nature of the outside work. Spagnola Dep. 312:17–314:9, Pls. Ex. 175. But no investigation seems to have been conducted. PSAMF ¶ 245. In yet another incident involving Iurato, a civilian accused him of harassing her at a traffic stop. PSAMF ¶ 246 (citing the harassment complaint filed against Iurato submitted by Plaintiffs as Exhibit 75, filed under seal). Lt. Clark was assigned to investigate the incident and cleared Iurato without interviewing the other officers present during the stop. PSAMF ¶ 245 (citing Clark Dep., Pls. Ex. 140).

Lt. Clark separately testified that while he witnessed instances of excessive force by PPD officers, he never once reported such incidents in his 30 years on the force, and has no knowledge of whether Internal Affairs investigated those incidents. Clark Dep. 89:17–90:24, Pls. Ex. 140. Echoing that testimony, Sgt. Reid stated that, in his entire career, he is not aware of any PPD supervisor disciplining a detective for misconduct during an investigation. Reid Dep. 146:24–147:15, Pls. Ex. 131. Sgt. Reid also testified that he is not aware of any supervisor disciplining a detective for failing to include critical information in a report. *Id.* at 148:1–9.

### d.  Additional Statements from Paterson's Policymaker

As noted, the record includes statements and deposition testimony of Chief Munsey,

Paterson's final policymaker for purposes of *Monell* liability. Plaintiffs contend that Chief Munsey's testimony, along with statements he made about the PPD during his tenure leading the department, support their argument that PPD's culture of impunity was widely known and even purposefully maintained. Pls. Opp. Br. 35-36. For example, Plaintiffs produced a newspaper article about Chief Munsey published in *The Herald-News* six months after the murder of Merino that states in relevant part:

> [Chief Munsey] bitterly resents anyone pointing accusing fingers at his officers saying they are too rough and tough. Paterson cops, it has often been said—and written—are like a Gestapo force on the loose. They are too quick in slapping people around, too hasty in pulling law abiding citizens over, too eager to confront. "I absolutely resent that," Munsey snapped. "Because it is unfair. And all I ever wanted is fairness."

Pls. Ex. 81. In the article, Chief Munsey indicated that he resented the unique "scrutiny" that comes with policing—scrutiny by "internal affairs, by municipal court, by civil suits, [and] reporters." *Id.* He also characterized PPD as an organization unfairly "picked upon." *Id.* On the other hand, the article notes that Chief Munsey, who worked in Internal Affairs for five years before becoming chief, insisted that he was not overly protective of his officers when they faced brutality charges, letting Internal Affairs handle investigations before studying the findings to make a final judgment. *Id.*

In his deposition, Chief Munsey testified that it was important to follow local news coverage of the PPD, and that he did so, particularly for high profile cases. Munsey Dep. 53:13–57:9, Pls. Ex. 138. He stated that there was "enormous pressure" on PPD to solve the Merino murder, as there was for all homicides. *Id.* at 70:10-71:20. Plaintiffs highlight Chief Munsey's agreement with the statement that "paying too much attention to the degree of force police officers use, is bad for police and bad for communities." *Id.* at 120:6–10. He made that view known among the officers under his command. *Id.* 120:10–15. However, as Paterson underscores, Chief Munsey was brought in to lead the PPD following misconduct scandals and was "instrumental in removing 22 detectives from the department in coordination with the County Prosecutor." Paterson Stmt. Of Add'l Material Facts (Paterson SAMF) ¶ 1, Kelly ECF No. 247; Lee ECF No. 221.

### 2.    *Paterson's Response*

Paterson argues that Plaintiffs' evidence of PPD's alleged culture of impunity is based solely on inadmissible facts, irrelevant news articles lacking probative value, and mischaracterizations of the record. Paterson Reply Br. 6, Kelley ECF No. 246, Lee ECF No. 220. First, Paterson questions the propriety of the submitted news articles, reminding the Court of the general evidence rule that articles are usually considered inadmissible hearsay. *Id.* The Court is mindful of Federal Rules of Evidence 801 and 802, but finds statements from the abovementioned articles proper at this juncture under Rule 807 and

consistent with decisions of other courts that have considered facts from newspapers to evaluate *Monell* claims at the summary judgment stage. *See, e.g., Thomas v. City of Philadelphia*, No. 17-4196, 2019 WL 4039575, at *15 (E.D. Pa. Aug. 27, 2019) (referencing a four-part reporting series by the *Philadelphia Inquirer* exposing a pattern of misconduct by homicide detectives that mirrored the unlawful conduct in that case). The residual hearsay exception applies when the statement at issue "is supported by sufficient guarantees of trustworthiness" and is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). Second, Paterson challenges the relevancy of such articles, arguing they lack probative value. As the Third Circuit explained, "evidence is not irrelevant merely because it does not show causation, does not specifically pertain to one unit of [a] police department, or does not focus on the particular activities carried out by the officers that were involved in [a plaintiff's] encounter. It is only irrelevant if it bears on no aspect of the overarching theory and its underlying elements." *Forrest*, 930 F.3d at 114-15. In light of this instruction, the Court will not "unduly narrow" Plaintiffs' evidence at this stage because, as discussed further below, a reasonable jury may consider that certain facts from relevant articles—in combination with other admissible evidence, including deposition testimony—demonstrate PPD's longstanding culture of impunity that caused Plaintiffs' civil rights violations. *See id.* at 114. Finally, as to Plaintiffs' purported mischaracterization of the record, *see* Paterson Reply Br. 6-7, the Court is capable of reviewing and interpreting deposition testimony and does not rely on either party's description of any exhibits.

### 3. Municipal Liability Under a "Custom" Theory

Plaintiffs contend that, during the 1980s and 1990s, the PPD had a pattern, practice, and custom of violating the constitutional rights of criminal suspects and citizens—including systemic violations of the Fourth Amendment—and, relatedly, a pattern, practice, and custom of failing to take appropriate disciplinary or other corrective actions against officers who engaged in such violations. Kelley Compl. ¶¶ 124-125, Lee Compl. ¶¶ 122-123. They further allege that the PPD officers, acting with impunity, "engag[ed] in unlawful interrogation of suspects, witness detentions and interrogations, fabrication of witness and suspect statements, failing to disclose exculpatory evidence, and engaging in corruption." Kelley Compl. ¶ 125, Lee Compl. ¶ 123.

A plaintiff can prevail on a "custom" claim under *Monell* by (1) "showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law" and (2) establishing an "affirmative link" between the custom and the alleged constitutional violation. *Est. of Roman*, 914 F.3d at 798 (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)) (internal quotation marks omitted). Liability based on custom, as opposed to a formal adopted policy, proceeds on the theory that the relevant practice is so widespread as to have the force of law. *Colon v. City of Paterson*, 12-1653, 2014 WL 4441503, at *5 (D.N.J. Sept. 9, 2014) (citing *Board of County Com'rs. of Bryan County, Okl. v. Brown*, 520 U.S.

397, 404 (1997)). This type of liability does not require a showing of deliberate indifference. *Forrest*, 903 F.3d at 105–06. Custom may instead be established by proof of knowledge and acquiescence. *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989). Specifically, liability is attributed to the municipality through a policymaker's actual or constructive knowledge of and acquiescence in the unconstitutional custom or practice. *See Bielevicz*, 915 F.2d at 854. In other words, knowledge or a showing that the municipal policymaker *should have known* about the pattern of constitutional misconduct is sufficient. *See Forrest*, 930 F.3d at 109.

But simply establishing a custom is not enough. *Est. of Roman*, 914 F.3d at 789. A plaintiff must also show the custom was the "proximate cause" of their injuries and can do so by demonstrating a "plausible nexus or affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue." *Bielevicz*, 915 F.2d at 850 (internal citation and quotation marks omitted). Notably, causation is typically question for the jury. *Colon*, 2014 WL 4441503, at *5 (citing *Panas v. City of Philadelphia*, 871 F. Supp. 2d 370, 378 (E.D. Pa. 2012)). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz*, 915 F.2d at 851.

Paterson argues that Plaintiffs have failed to produce evidence that the alleged unlawful conduct was so commonplace or well-settled as to virtually constitute the law. *See* Paterson Mot. at 5. The City further claims the record is "absolutely devoid" of documentary evidence or testimony related to the Chief Munsey's knowledge of any pattern of similar constitutional violations. *Id.* The Court disagrees. The record evidence shows that the PPD had a long history of overlooking or mishandling police officer misconduct, which fostered a culture of impunity that caused the constitutional deprivations in this case. Viewing the record in a light most favorable to Plaintiffs, various evidence cited above combine to raise disputed issues of material fact as to whether Paterson had a custom of tacitly permitting the misconduct of officers, creating a culture of impunity, that ultimately caused Plaintiffs' injuries. Summary judgment on Plaintiffs' *Monell* claim under the custom theory is therefore **denied**.

### 4. Municipal Liability Under a "Failure-or-Inadequacy" Theory

The failure-or-inadequacy theory of municipal liability under § 1983 requires a plaintiff to establish that a municipality's failure to train, supervise, and discipline its officers "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). This consists of establishing whether "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).

While the record contains sufficient facts supporting Plaintiffs' claim for failure to supervise and discipline—the record is replete with instances of open and egregious misconduct during the relevant time period that was never subjected to meaningful discipline—there is less evidence to bolster their failure-to-train theory. In a claim for municipal liability based on failure-to-train, to prove deliberate indifference, a plaintiff "needs to show that a defendant was on notice that, absent additional specialized training, it was so predictable that failing to train the municipal employees amounted to conscious disregard for the constitutional rights of citizens." *Diaz v. City of Philadelphia*, 670 F. Supp. 3d 174 (E.D. Pa. 2023) (cleaned up) (citing *Connick v. Thompson*, 563 U.S. 51, 71 (2011)). The alleged deficiency in a training program must be closely related to the alleged constitutional injury because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 392 (1989). Typically, "[a] pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick*, 563 U.S. at 62) (internal quotation marks omitted).

Paterson has produced records indicating PPD officers underwent police training, and Plaintiffs have not cited compelling facts within the evidentiary record regarding specific deficiencies in the department's training program. *See Lapella v. City of Atlantic City*, No. 10-2454, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012) (to sustain an inadequate training theory, plaintiff must identify the precise deficiency in training). Further, various evidence cuts against Plaintiffs' arguments that the PPD failed to train its officers. For example, the *Herald-News* profile of Chief Munsey states that he "sends his officers, and himself, to the yearly recommended sensitive training to try to avoid the hard edges." Pls. Ex. 81.

In sum, on the "failure or inadequacy" theory, the Court will **grant** summary judgment on the aspect of Plaintiffs' *Monell* claim dealing with failure to train, and will **deny** summary judgment with respect to failure to supervise and discipline.

## C. New Jersey State Law Claims

Plaintiffs bring a series of state law claims against the individual Defendants and Paterson. As noted, Plaintiffs allege violation of the NJCRA against all individual Defendants and Paterson (Count XII for both), as well as the following common law claims:

- Malicious prosecution against all individual Defendants (Count VIII for both);

- Intentional infliction of emotional distress against all individual Defendants

(Count IX for both);

- Negligence and gross negligence against all individual Defendants and Paterson (Count X for both); and

- Negligent supervision and training against Lt. Clark, Sgt. Stell, Sgt. Reid, and Paterson (Count XI for both).

### 1.  State Law Claims Against Individual Defendants[13]

Based on the existence of genuine issues of material facts, *see* Part A in discussion above, the motions for summary judgement by Defendants Sgt. Stell, Jordan, Nieves, Reyes are **denied** as to Counts VIII (malicious prosecution), IX (intentional infliction of emotional distress), and X (negligence and gross negligence).[14] Summary judgment is **granted** as to Finer, Smith, Iurato, Sgt. Reid, and Lt. Clark on Counts VIII, IX and X; Plaintiffs' factual allegations against those individual Defendants show their limited involvement in the investigation and as such, do not present genuine issues of material facts upon which a jury could find for Plaintiffs on those claims. Summary judgment against Sgt. Reid, Sgt. Stell, and Lt. Clark on Count XI (negligent supervision and training) is **denied**.

### 2.  State Law Claims Against Paterson[15]

Under Count X, Plaintiffs seek to hold Paterson liable for negligence and gross negligence, which involves a breach of a duty of care that causes injury. *See Roccisano v. Township of Franklin*, No. 11-6558, 2013 WL 3654101, at *11 (D.N.J. July 12, 2013) (citing *Weinberg v. Dinger*, 542 A.2d 366, 373 (N.J. 1987)). To establish negligence, a plaintiff must show: (1) a duty of care, (2) a breach of that duty, (3) causation, and (4) damages. *Id.* (citation omitted). As to gross negligence, "the difference between gross and ordinary negligence is one of degree rather than of quality." *Smith v. Kroesen*, 9 F. Supp. 3d 439, 442 (D.N.J. 2014) (cleaned up) (citations omitted). Further, gross negligence refers to behavior which constitutes "an indifference to consequences." *Banks v. Korman Assocs.*, 218 N.J. Super. 370, 527 A.2d 933, 934 (N.J. App. Div. 1987). Based on the existence of genuine issues of material facts, *see* Part B in discussion above, the motion for summary

---

[13] *See* n.7, *supra.*

[14] The Court does not address the issue of a public employee's immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, *et seq.* for acts in good faith, which Defendants have not raised.

[15] NJCRA claims are analogous to their § 1983 federal counterparts and therefore analyzed "through the lens of § 1983." *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289 (D.N.J. 2012). Accordingly, the Court need not conduct a separate analysis of Count XII as to Paterson. As discussed above, there are genuine issues of material fact precluding summary judgment on the corresponding *Monell* claim under theories of unconstitutional custom and failure to supervise and discipline.

judgement by Paterson is **denied** as to Count X.

Plaintiffs also allege Paterson is liable for negligent supervision and training (Count XI). To establish this cause of action, a plaintiff must present evidence demonstrating: (1) that the municipality "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) "that, through the negligence of the employer in [training or supervising] the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." *G.A.-H. v. K.G.G.,* 210 A.3d 907, 916 (N.J. 2019) (quoting *Di Cosala v. Kay*, 450 A.2d 508, 516 (N.J. 1982)). Plaintiffs offered sufficient evidence regarding the City's failure to supervise and discipline its officers, allowing the individual Defendants in this case to allegedly violate Plaintiffs' civil rights with impunity. Since there are genuine issues of material fact that demonstrate that the City was negligent in the supervision of the individual Defendants, summary judgment against Paterson on Count XI is **denied**.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary judgment is **granted** in favor of all individual Defendants on Count I of Mr. Kelley's Complaint and Count II of Mr. Lee's Complaint;

2. Summary judgment is **granted** in favor of all individual Defendants on the Fourteenth Amendment malicious prosecution claims in Count III of Mr. Kelley's Complaint and Count I of Mr. Lee's Complaint;

3. Summary judgment on the Fourth Amendment malicious prosecution claims in Count III of Mr. Kelley's Complaint and Count I of Mr. Lee's Complaint and on the state law malicious prosecution claim in Count VIII of both Complaints is **denied** as to Sgt. Stell, Nieves, Jordan, and Reyes but **granted** as to Sgt. Reid, Smith, Finer, Iurato, and Lt. Clark;

4. Summary judgment is **denied** on the Fifth Amendment right against self-incrimination in Count II of Mr. Kelley's Complaint against Stell, Reyes, and Jordan, and **granted** as to Finer and Smith;

5. Summary judgment is **denied** on the Fifth Amendment right against self-incrimination in Count III of Mr. Lee's Complaint against Stell, Reyes, Nieves and **granted** as to Iurato;

6. Summary judgment is **granted** in favor of all individual Defendants on the failure to intervene claim in Count V of both Complaints;

7. Summary judgment is **denied** on the civil rights conspiracy claim against all individual Defendants in Count IV of both Complaints;

8. Summary judgment is **denied** on the supervisory liability claims against Sgts. Reid, Stell, and Lt. Clark in Counts VI and XI of both Complaints;

9. Summary judgment on the intentional infliction of emotional distress and negligence-based state law claims in Counts IX and X is **denied** as to Defendants Sgt. Stell, Jordan, Nieves, Reyes, but **granted** as to Finer, Smith, Iurato, Sgt. Reid, and Lt. Clark;

10. Summary judgment is **denied in part** and **granted in part** on the NJCRA claim in Count XII of both Complaints against the individual Defendants consistent with the Court's decisions on the federal constitutional claims;

11. The intentional infliction of emotional distress claim against Paterson in Count IX is **dismissed** pursuant to Plaintiffs' agreement to drop the claim against the City;

12. Summary judgment is **denied in part** and **granted in part** on the municipal liability claim against Paterson in Count VII of both Complaints;

13. Summary judgment is **denied** on the negligence-based state law claims against Paterson in Count X of both Complaints;

14. Summary judgment is **denied** on the negligent supervision and training claim against Paterson in Count XI of both Complaints; and

15. Summary judgment is **denied** on the NJCRA claim against Paterson in Count XII of both Complaints.


An appropriate order follows.


**DATE**: February 26, 2025


WILLIAM J. MARTINI, U.S.D.J.